IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON/GREENWOOD DIVISION

| | |
|---|---|
| Joy Wakefield-Brace,                                    )<br>                                    )<br>                    Plaintiff,          )<br>                                    )<br>          vs.                        )<br>                                    )<br>Greenwood School District 50,          )<br>                                    )<br>                    Defendant.          )<br>_____) | Civil Action No. 8:16-cv-2750-MGL-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This matter is before the court on the defendant's motion for summary judgment (doc. 14). In her complaint, which was originally filed in state court, the plaintiff alleges that the defendant, her former employer, discriminated against her because of her age and/or race in violation of the Age Discrimination in Employment Act ("ADEA") and Title VII of the Civil Rights Act of 1964, as amended (doc. 1-1). She also alleges a state law claim for defamation (*id.*).

The defendant removed the case to this court on August 5, 2016 (doc. 1). Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civil Rule 73.02(B)(2)(g) (D.S.C.), this magistrate judge is authorized to review all pretrial matters in employment discrimination cases and submit findings and recommendations to the district court.

## FACTS PRESENTED

The plaintiff, who is a black female (doc. 1-1 at 3), was 55 years old at the end of her employment with the defendant (doc. 14-3 at 51). She is a teacher with more than 30 years of experience in education (doc. 17-1). Prior to moving to South Carolina, the plaintiff taught at Cotswold Elementary School in Charlotte, North Carolina for 30 years (*id.* at 3). The plaintiff has a Bachelor's Degree in Elementary Education and a Master's Degree in Elementary Education with a concentration in Curriculum and Instruction (*id.*). Prior to the actions taken by the defendant, the plaintiff was consistently positively

evaluated, and no adverse employment actions were taken against her throughout the entirety of her 30-year teaching career (*id.* at 4).

On July 29, 2014, the plaintiff applied for employment with the defendant (doc. 17-1 at 1). Thereafter, the plaintiff was in contact with Gail Davis in Human Resources and Lauri Cothern at the District Office (doc. 17-2 at 1).[1] The plaintiff expressed an interest in being a literacy coach or a literacy teacher (*id.*). The plaintiff interviewed with Amy Hildenbrand, Principal at Mathews Elementary School, and Julian Gale (*id.*). After the interview, the plaintiff was told a literacy position was not available (doc. 17-2 at 1).

Shortly thereafter, in early August 2014, Ms. Hildenbrand made telephone calls to the plaintiff and asked her if she was interested in a long term substitute position for a teacher on medical leave or a teacher assistant position at Mathews Elementary School (*id.* at 1-2; *see also* doc. 14-3 at 34). Ms. Hildenbrand told the plaintiff that she was still looking out for her and that she just had to have her at her school (doc. 17-2 at 2). The plaintiff communicated her thanks, but informed Ms. Hildenbrand that she was still seeking full time employment for an entire school year (*id.* at 1-2). Around this time, Mrs. Davis also explained the process for a position with the District pending the confirmation of the plaintiff's "Highly Qualified" status by the South Carolina Department of Education ("DOE") (*id.*).

On Saturday, August 16, 2014, Ms. Hildenbrand called the plaintiff to tell her there was a position for an office assistant available (doc. 14-2, pl. dep. 29). The plaintiff communicated her thanks and that she would be happy to volunteer and help out, but she was still seeking a certified teacher position (*id.*). The plaintiff reported to work at Mathews

---

[1] The facts cited by the plaintiff in support of her opposition to the motion for summary judgment are largely taken from her unsworn and unsigned notes entitled "Summary of the 2014-2015 School Year" (*see* doc. 17-2). In its reply, the defendant argues that the document contains "significant amounts of inadmissible evidence" (doc. 22 at 1). *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). While this may be true, even considering the document in its entirety, the plaintiff's claims cannot survive summary judgment, as will be discussed below.

Elementary School on the morning of Monday, August 18, 2014, and she began working in the office on a volunteer basis (*id.*).

On that same day, Ms. Hildenbrand told the plaintiff said that she received approval from the District Office to hire another third grade teacher, and she asked the plaintiff is she was interested in the position (*id.* 29-30). The plaintiff said "yes" (*id.* 30). Ms. Hildenbrand introduced the plaintiff to the other third grade teachers at the school and showed the plaintiff her classroom (*id.*). The plaintiff was officially hired as a third grade teacher at Mathews Elementary School for the 2014-2015 school year on August 18, 2014 (doc. 14-3 at 1). A special condition of the plaintiff's employment was that she receive "Highly Qualified" status from the DOE by October 1, 2014, as required by the regulations of the No Child Left Behind Act (*id.*). Thereafter, the plaintiff's direct supervisor was Ms. Hildenbrand (Caucasian female, 46 years old) (doc. 14-1 at 2; doc. 14-3 at 51).

The plaintiff was given the roster of 16 students who would be in her classroom (doc. 17-2 at 3). The plaintiff was told (and Ms. Hildenbrand confirmed) that the students selected for her classroom were the students whose parents did not show up for parent orientation (*id.*; doc. 14-3 at 34). In her 30-year teaching career, the plaintiff had never witnessed a class being organized based upon parents not showing up for school orientation (doc. 17-2 at 3).

The first day of teaching was the next day, August 19, 2014 (*id.* at 2). The plaintiff did not receive a key to her third grade classroom until months after the 2014-2015 school year began (doc. 17-3, pl. dep. 42-43; doc. 14-3 at 35-36). According to Ms. Hildenbrand, at the beginning of the school year, all teachers were told to go to the school secretary to obtain a classroom key (doc. 14-3 at 35). When Ms. Hildenbrand realized that the plaintiff did not have a classroom key (after the plaintiff for several days sent a student to borrow Ms. Hildenbrand's master key), she asked about it (*id.*). The plaintiff told Ms. Hildenbrand that it was going to take a while to obtain the key because a new one needed to be made and people were behind (*id.*). A few weeks later, Ms. Hildenbrand again was told by the plaintiff that the key was being made (*id.*). According to Ms. Hildenbrand, she

3

asked the school secretary in December when she thought a key would be ready for the plaintiff, and the school secretary stated that the plaintiff had never asked for a key, and immediately obtained a key from the vault to give to the plaintiff (*id.* 35-36). The plaintiff notes that the other two new teachers during the 2014-2015 school year, Tiffany Pace and Valencia Tiller, both of whom are Caucasian and under the age of 40, were given keys to their classrooms at the beginning of the school year (doc. 17-3, pl. dep. 42-43; doc. 14-3 at 35-36). She claims that she "inquired about [the key] a couple of times and was told to double check with the secretary," which she did (doc. 17-3, pl. dep. 42). She received a key a couple of weeks prior to her dismissal from the position (*id.*). The plaintiff also claims she did not receive an access card to enter the school building until about three months into the 2014-2015 school year (*id.* 43), while other teachers were given keycards at the beginning of the school year (doc. 14-3 at 56-57).

During the first 20 days of school, teachers at Mathews were expected to set the procedures for guided reading and the Reader's Workshop (doc. 14-3 at 36). The plaintiff indicated that she was familiar with this program and would not have any problem implementing the Reader's Workshop. All teachers were to complete running records on the students to be able to group students for guided reading (*id.*). Visits by Literacy Coach Tracye Peden in November 2014 revealed that the plaintiff had not started running records (*id.*). As such, Ms. Peden had to complete the running records and help form groups for the classroom (*id.*). Further, it became clear that a balanced literacy program, an initiative at Mathews that was required to be implemented by all teachers, was not established despite the plaintiff stating that she understood the model (*id.*). Ms. Peden observed, modeled, and/or coached in the plaintiff's classroom on the following dates: November 17, 29, 20, and 21, 2014, and December 1, 2, 3, 8, 9, 10, 12, and 15, 2014 (doc. 14-3 at 24-25).

The plaintiff taught the third grade class from August 19, 2014, to January 27, 2015 (doc. 17-2 at 3-6). She received the "Highly Qualified" status from the DOE during her first 30 days of teaching at Mathews (*id.* at 4).

4

The plaintiff dealt with a lack of resources, including math textbooks that were distributed in mid-September and social studies and science textbooks that were distributed in the beginning of October (*id.* at 3-4). Up to the plaintiff's last day of teaching at Mathews on January 27, 2015, she was only given the teacher editions for the math textbooks, and she never received the science or social studies teacher editions, nor did she receive a set of reading books for the students or teacher (*id.* at 13). During the first 30 days of teaching third grade, the plaintiff assessed all of her student's writing, reading fluency, and comprehension skills (*id.* at 4). After gathering the data, the plaintiff began to divide the students in her classroom into guided reading groups based upon their ability levels (*id.*). There were four distinct groups, and one student was in the English for Speakers of Other Languages ("ESOL") program and received individualized and differentiated instruction from the plaintiff based upon the state ESOL standards for K-12 learners (*id.*). The plaintiff claims that Ms. Peden complimented her on how organized her balanced reading classroom was working (*id.* at 5). Ms. Peden told the plaintiff that she was "doing the right thing," and she was going to use the plaintiff's classroom as a "model classroom" (*id.* at 5).

On November 20, 2014, Christi Louden (African-American female, 38 years old (doc. 14-1 at 3)), then the defendant's Director of Staff Development and Evaluation and currently the Assistant Superintendent for Human Resources, observed the plaintiff's classroom and noted that "[t]he learning environment was not conducive for students. Discipline issues were not addressed as needed and that interfered with the teaching and the learning environment for the students" (doc. 14-3 at 2-4).

A parent called and reported to school administration that her child had been "jacked up" by the plaintiff (doc. 14-3 at 35).[2] Administration investigated the incident, and the plaintiff admitted to physically touching and moving the child because "she was getting ready to get trampled on" and she had refused to move (doc. 14-2, pl. dep. 67). The

---

[2] It is unclear when this incident occurred.

plaintiff was reminded that she should not put hands on any student and should call the office for assistance if she needed help (doc. 14-3 at 35).

As an annual contract teacher, the plaintiff was required to complete the DOE's Summative ADEPT Formal Evaluation of Classroom-Based Teachers ("SAFE-T") evaluation, in which observers monitored her classroom on separate occasions (doc. 14-2, pl. dep. 35-36). On December 12, 2014, the plaintiff was given a SAFE-T Summary (ET3) in which Ms. Hildenbrand and Patti Scarborough, Assistant Principal (Caucasian female, 68 years old (doc. 14-1 at 4)), assessed the plaintiff as not meeting expectations for three of the four domains: planning, instruction, and environment (doc. 14-3 at 5-20). Specifically, with regard to the planning, observers noted, among other things, that there was a definite lack of instruction in the classroom and that the plaintiff failed to adequately plan for instruction with her long-range plans and short-range plans (*id.* at 30). Observers noted that instruction did not match the pacing guides, and the plaintiff failed to provide guided reading plans after being reminded of this expectation (*id.*). With regard to the instruction domain, it was noted that students were off task and not focused on their learning (*id.* at 12-16). Specifically, it was noted that while the plaintiff planned for a variety of instructional practices, "her students' behavior precludes the level of meaningful learning for the majority of the class" and "behaviors in the classroom often derail her intent" (*id.*). With regard to the environment domain, observers noted that the plaintiff had a "challenging group of students," and she did "address several behaviors quickly, but some misbehaviors are overlooked or not noticed" (*id.* at 17-18). Also, transitions were not handled in a smooth manner, and instructional time was lost with distribution of materials and transitions (*id.*). The plaintiff received an overall rating of "Not Met" on her preliminary evaluation (*id.* at 5).

The plaintiff contested the findings that she was not meeting the planning, instruction, and environment SAFE-T expectations (doc. 17-2 at 5-6). In response, Ms. Hildenbrand and Ms. Scarborough told the plaintiff that during the second semester of the 2014-2015 school year she would receive help as well a mentor on the teaching team, Ms. Louden (*id.* at 6). Ms. Scarborough suggested that the plaintiff focus on reading

comprehension in the classroom, and the plaintiff responded that she had thought about that area of focus as well and that she looked forward to developing a new unit because reading comprehension and writing were two of the plaintiff's greatest strengths in the classroom (*id.*). The plaintiff had already purchased the materials to begin a reading comprehension unit centered on novel/literacy book clubs, and she had already explained to the students that would be the classroom's focus after the winter break (*id.*).

The plaintiff was also given a Professional Growth and Development Plan ("Growth Plan") on December 12, 2014 (doc. 14-3 at 21-23). The Growth Plan indicated that an "[i]nitial conference to develop PGD plan" and the "[b]eginning date for implementing plan" were completed on December 12, 2014 (*id.* at 21). The next step of the Growth Plan, called the "[p]reliminary review/conference," was scheduled for February 11, 2015 (*id.*).

On January 8, 2015, via email, Ms. Hildenbrand instructed the plaintiff to report to Springfield Elementary School for a half day on January 9, 2015, to observe a class transition into a reader's workshop (doc. 14-3 at 26; doc. 17-2 at 9). The email stated that Ms. Peden would teach the plaintiff's class while she was gone (doc. 14-3 at 26). The plaintiff stayed after school on January 8, 2015, until 6:30 p.m., to prepare accordingly (doc. 17-2 at 9).

The plaintiff was too ill to work on January 9, 2015, and she logged into the automated system for substitute teachers to schedule a substitute for the day and to inform Ms. Hildenbrand that she was sick (*id.*; doc. 14-3 at 26-27). The observation was rescheduled for Tuesday, January 13, 2015, and the plaintiff was notified of this via email by Ms. Hildenbrand with Ms. Scarborough and Ms. Peden copied on the email (doc. 14-3 at 27; doc. 17-3 pl. dep. 50-51).

On Tuesday, January 13, 2015, the plaintiff returned to work from being out of work sick (doc. 17-2 at 9). Ms. Peden went to the plaintiff's classroom and informed her that she was covering the classroom, that the plaintiff was to report to Springfield Elementary at 9:00 a.m., and that she had been informed of this via email (*id.*; doc. 14-3

7

at 27). The plaintiff told Ms. Peden that she had been out sick and had not read any emails (doc. 17-2 at 9). She further told Ms. Peden that grades were due that day and she had to get them in by 3:30 p.m., but if it was more important for her to observe the class at Springfield Elementary, she would be happy to go there (*id.*). Ms. Peden then went to Ms. Hildenbrand and purportedly relayed the plaintiff's message (*id.* at 10). Ms. Peden returned to the plaintiff's classroom and informed the plaintiff that Ms. Hildenbrand instructed the plaintiff to stay at the school and submit her grades (*id.;* doc. 17-3, pl. dep. 50-52).

During the next week, the week of January 12, 2015, Ms. Hildenbrand was absent from the school, and she returned to school during the week of January 20th (the school was closed on January 19, 2015, in honor of Martin Luther King, Jr. Day) (doc. 17-2 at 10). Between the preliminary SAFE-T evaluation and the plaintiff's dismissal from the third grade teaching position, there were only a few days in which the plaintiff could have been observed or evaluated by Ms. Hildenbrand (doc. 17-5). Specifically, those dates are limited to December 15, 16, 17, 18, and January 5, 6, 7, 8, 13, 14, 15, 16, 20, 21, 22, 23, and 26 (*id.*). During that time period, the plaintiff was not given the subsequent steps listed in the Growth Plan (doc. 14-3 at 21) and was not given a final SAFE-T evaluation (doc. 14-3 at 5).

In a memorandum to Assistant Superintendent Randy Vaughn (Caucasian male, 64 years old (doc. 14-1 at 2)), dated January 15, 2015, Ms. Hildenbrand stated in pertinent part: "Based on her most recent [Measures of Academic Progress ("MAP")] scores, [the plaintiff] only has 4 out of her 16 students scoring at or above normal grade level mean RIT. . . ." (doc. 14-3 at 31). Moreover, Ms. Hildenbrand noted that the plaintiff's students' MAP scores "showed a lack of progress," with only 47% of the students meeting their expected gains in reading and 23.5% meeting their expected gains in math (doc. 14-3 at 37).

On January 27, 2015, at around 4:00 p.m., Ms. Hildenbrand and Ms. Scarborough met with the plaintiff in her classroom (doc. 17-2 at 6; doc. 14-3 at 32). Ms. Hildenbrand told the plaintiff that her services were no longer needed at the school, and she

8

was "no longer a good fit" (doc. 17-2 at 6). The plaintiff then asked, "why?" and was told that her students' data was not showing improvement, students' behavior was not improving, and the plaintiff failed to go to Springfield Elementary School for observation (*id.*). The plaintiff informed Ms. Hildenbrand and Dr. Scarborough that she had tracked her student's data through the MAP testing and that the majority of the students had shown significant improvements in literacy and math under her tutelage (*id.* at 7). With regard to her students' behavior, the plaintiff informed Ms. Hildenbrand and Ms. Scarborough that there was only one student that was not following classroom rules and procedures consistently and that she had taken all of the remedial steps available to her by having regular contacts with school administration and the student's mother and by creating a behavior plan for that particular student (*id.*). The student in question was dealing with academic struggles that caused him to act out at school, and the plaintiff was in constant communication with his mother to try to help the student with learning and with behavioral modification (*id.*). The plaintiff had also made plans to begin after school tutoring during the third quarter in preparation for the ACT Aspire testing in April 2015 (*id.*). With regard to her alleged failure to go to Springfield Elementary School for observation, the plaintiff reminded Ms. Hildenbrand and Ms. Scarborough about her willingness to go for observation "any day of the school year" (*id.* at 7-8). Ms. Hildenbrand then responded, "You said that you were not going to go," and the plaintiff responded, "You never heard me say that I was not going to go to Springfield" (*id.*). Ms. Hildenbrand then responded, "Mrs. Peden, the literacy coach, said that you weren't going" (*id.* at 8).

Ms. Hildenbrand then informed the plaintiff that she needed to gather whatever belongings she needed and to report to work at the Early Childhood Center ("ECC") the next morning, on January 28, 2015 (*id.* at 8). The plaintiff responded, "You mean I won't even be able to tell my students goodbye?," and Ms. Hildenbrand responded, "No" (*id.*). Ms. Hildenbrand told the plaintiff that if she did not finish gathering her personal belongings that night she was to come to the school on Saturday to retrieve the remainder of her personal belongings (*id.*). The plaintiff was very upset and asked if she could take

the next day off (*id.*). Ms. Hildenbrand responded that she would talk to Assistant Superintendent Vaughn about the plaintiff's request for a day off (*id.*).

While packing her belongings, the plaintiff discovered a letter left on her table from Ms. Hildenbrand, notifying her to leave the school and where to report the next day (*id.*; doc. 14-3 at 33). The letter from Ms. Hildenbrand also notified the plaintiff that she would recommend the non-renewal of the plaintiff's annual contract for the 2015-2016 school year for the following reasons: her "classroom performance has not been satisfactory"; she "failed to implement balanced literacy"; she "failed to adopt clear routines and procedures in [her] classroom"; and her "classroom is not a safe environment that is conducive to learning" (doc. 14-3 at 33). The letter stated that the plaintiff's work schedule would remain the same and her pay would continue on the teacher salary schedule for the remainder of the 2014-2015 school year (*id.*).

The plaintiff reported to the ECC on January 28, 2015, and thereafter worked as a substitute teacher when the ECC teachers were absent; answered phone calls; filed papers; answered doors; participated with the morning and afternoon car and bus duties; escorted students to calls; laminated, cut, faxed, and copied papers; made bulletin boards; registered new students for the 2015-2016 school year; and worked daily with approximately 22 students with academic areas of concern (doc. 17-2 at 10).

The plaintiff's position at Mathews Elementary was filled by Kayla Christley, who is a Caucasian female around 22 or 23 years old (doc. 17-3, pl. dep. 73). On March 30, 2015, the plaintiff received an email from Ms. Christley asking for the plaintiff's input regarding student(s) she recommended for retention (doc. 17-2 at 12). Ms. Christtley also stated in her email that the plaintiff's students missed her and talked about her regularly and that the plaintiff had made an impact on their lives (*id.*).

On February 27, 2015, ECC Director Jean Powell called the plaintiff to her office and told the plaintiff that she had received an email from Assistant Superintendent Vaughn wanting to know if the plaintiff was planning on resigning or going before the School Board (doc. 17-2 at 11). The plaintiff responded that she had no desire to resign because

10

she had no reason to resign and that she should be in her previous third grade classroom completing the school year with the students she began teaching in August 2014 (*id.*). The plaintiff explained to Ms. Powell that she had not discussed her prior assignment at Mathews because she respected her too much and did not want to involve her in anything prior to her coming to ECC, and Ms. Powell expressed her appreciation for the plaintiff not wanting to involve her (*id.*).

By letter dated February 27, 2015, Assistant Superintendent Vaughn notified the plaintiff that he was recommending to the Superintendent that the plaintiff's employment as an annual contract teacher not be renewed for the reasons set out in the January 27, 2015, letter from Ms. Hildenbrand (doc. 14-3 at 39). He noted that Ms. Powell had explained the option of resignation in lieu of termination to the plaintiff, and she had chosen not to resign; however, if the plaintiff chose that alternative, she was to let him know by March 11, 2015 (*id.*).

After receiving the letter, the plaintiff approached Ms. Powell to verify that Assistant Superintendent Vaughn had sent Ms. Powell an email (doc. 17-2 at 11). Ms. Powell stated that it was not an email but that she had spoken with him at a leadership meeting about whether the plaintiff would resign or go before the School Board (*id.*).

The plaintiff did not resign (*id.*; doc. 14-3 at 40), and on March 16, 2015, the District Superintendent, Dr. Darrell Johnson (African-American, 54 years old (doc. 14-1 at 7)), recommended to the School Board that the plaintiff's annual contract not be renewed for the 2015-16 school year, which the Board accepted (doc. 14-3 at 40-42). The plaintiff grieved the contract non-renewal and requested an informal hearing before Dr. Johnson in accordance with South Carolina law (*id.* at 41-42). The informal hearing was conducted on April 14, 2015 (*id.* at 43). In a letter dated April 27, 2015, Dr. Johnson set out the concerns regarding the plaintiff's teaching performance that were discussed at the hearing (*id.* at 44-45). Specifically, Dr. Johnson noted that Assistant Superintendent Vaughn, Ms. Hildenbrand, and Ms. Louden explained that school personnel had made multiple visits to the plaintiff's classroom and had observed multiple incidents of a failure to give instruction,

no guided reading plans in place, and a failure to use pacing guides (*id.*). Also, Ms. Hildenbrand had been called to the classroom on several occasions to address student discipline issues (*id.*). Dr. Johnson noted that school staff offered assistance to the plaintiff but there was no follow-through by her in response to the offers (*id.*). Dr. Johnson further noted that the plaintiff had received a "Not Met" on her SAFE-T evaluation and had refused to cooperate in the efforts of Ms. Hildenbrand and Ms. Scarborough to assist her in the areas needing improvement (*id.*). Dr. Johnson upheld the determination that the plaintiff's employment with the District should not be renewed and advised her of her right to appeal his decision to the School Board (*id.*).

In a letter dated May 4, 2015, the plaintiff appealed the decision to the School Board (*id.* at 46). In a letter dated May 19, 2015, the plaintiff was notified that her request for an appeal to the School Board was denied by a 6-0 vote, with one abstention (*id.* at 47). The Board concluded, based on the record, that there were reasonable grounds for the Superintendent to recommend the non-renewal of the plaintiff's contract (*id.*).

In a letter dated October 28, 2015, the plaintiff was notified that the defendant had informed the DOE that she had been terminated from employment as a result of her lack of classroom management, lack of instruction, and placing her hands on a student inappropriately (*id.* at 48-49). The letter from the DOE stated that, pursuant to State Board of Education Regulation 43-58.1 (2011), school district superintendents must report educator resignations and terminations to the DOE whenever the resignation or termination resulted from conduct that is reasonably believed to constitute grounds for revocation or suspension of the educator's certificate, which grounds include unprofessional conduct (*id.* at 49). The DOE informed the plaintiff that a determination had been made that no action would be taken against her educator certificate (*id.*).

The plaintiff claims that she was repeatedly approached by students, parents, and former co-workers from Mathews Elementary in the mall, at restaurants, grocery stores, through phone calls, and in the neighborhood where she lives, about why she was no longer working at the school (doc. 17-2 at 11-12).

In her deposition, the plaintiff testified as follows:

Q: What evidence do you have that these individuals, Amy Hildenbrand, Patti Scarborough, Randy Vaughn, Darrell Johnson, and the school board, what evidence do you have that they were taking actions because of your age?

A: Because I was replaced with a Caucasian female, recent graduate of Lander.

Q: And so that, that would be the basis for the claim of race and age discrimination, the age and race of your replacement at Mathews Elementary School?

A: Yes sir.

Q: Is there, is there any other evidence other than that that you believe indicates that there was age or race discrimination involved in those decisions?

A: No.

Q: For example, did you hear these individuals we've discussed, Amy Hildenbrand, Patti Scarborough, Randy Vaughn, Darrell Johnson or the school board use racial slurs?

A: No.

Q: Or make negative comments about your age?

A: No.

(Doc. 14-2, pl. dep. 77-78).

## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a

reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### Race and Age Discrimination

The plaintiff alleges that she "was subjected to disparate terms of condition of employment, demoted, transferred, and [her] teaching contract was not renewed for the 2015-2016 school year" based upon her race and/or age in violation of Title VII and the ADEA (doc. 1-1 at 6-7). A plaintiff may avoid summary judgment on a discrimination claim through two avenues of proof: by "presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision," or by relying on the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting framework. *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir.2004), *recognized as abrogated on other grounds by Foster v. Univ. of Md. – E. Shore*, 787 F.3d 243 (4th Cir. 2015)).

14

Because the plaintiff has not put forth any direct or circumstantial evidence to directly prove her claims of race or age discrimination, the court will apply the *McDonnell Douglas* framework to her claims. The parties agree that the *McDonnell Douglas* burden-shifting framework is applicable (doc. 17 at 17; doc. 14-1 at 12). To establish a *prima facie* case of disparate treatment under Title VII, a plaintiff must show: (1) she is a member of a protected class; (2) she was performing satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class received more favorable treatment. *Eyo v. Orangeburg Consol. Sch. Dist. Five*, C.A. No. 5:12-cv-03345-JMC, 2015 WL 1423164, at *10 (D.S.C. Mar. 27, 2015) (citation omitted). To establish a *prima facie* case of discrimination under the ADEA, a plaintiff mush show: (1) she is at least 40; (2) an adverse employment action; (3) satisfactory job performance; and (4) that similarly-situated younger employees received more favorable treatment. *Cepada v. Bd. of Educ. of Baltimore Cnty.*, 814 F. Supp. 2d 500, 513 (D. Md. 2011) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). In the case of a discharge claim, an inference of discrimination could be based on the plaintiff being replaced by someone from outside the protected class. *Ferguson v. Waffle House, Inc.*, 18 F. Supp. 3d 705, 719 (D.S.C. 2014). If the plaintiff can establish a *prima facie* case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-55 (1981) (this is a burden of production, not persuasion). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason by the defendant was not its true reason but was a pretext for discrimination. *Id*. at 253. *See Reeves,* 530 U.S. at 147.

For both her race and age claims, the plaintiff has presented evidence that she is a member of a protected class, and she suffered an adverse employment action when her contract was not renewed by the defendant. However, the undersigned finds that the plaintiff cannot establish that she was meeting the defendant's legitimate expectations. An employee may establish that she was meeting her employer's expectations by: (1)

pointing out concessions by her employer that she was performing satisfactorily at the time of the dismissal; (2) offering evidence of her prior satisfactory performance reviews; or (3) providing expert testimony as to the employer's performance expectations and an analysis of her performance in light of those expectations. *King v. Rumsfeld*, 328 F.3d 145, 149-50 (4th Cir. 2003). *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515–16 (4th Cir. 2006) ("Because a plaintiff must show by a preponderance of the evidence that he met the employer's legitimate job expectations to prove his *prima facie* case, the employer may counter with evidence defining the expectations as well as evidence that the employee was not meeting those expectations.").

   The evidence that the plaintiff offers to support her argument that she was meeting the defendant's job expectations falls short of what the law requires. The plaintiff claims in her response to the motion for summary judgment that the defendant created a "'paper trail' portraying [her] as an ineffective third grade teacher start[ing] before Thanksgiving 2014 and continu[ing] until she was removed from Mathews Elementary School . . . " (doc. 17 at 7). The plaintiff claims that the allegedly fabricated paper trail was created "around the same time" that Ms. Christley, a younger, Caucasian female who was hired to replace her, expressed an interest in teaching at Mathews Elementary (*id.* at 18). However, the exhibits cited by the plaintiff in no way support her argument that the defendant manufactured reasons to transfer her to the ECC and to not renew her contract so that it could hire Ms. Christley (*see id.* at 7 (citing doc. 14-3 at 2-31, 37-38; doc. 17-3, pl. dep. 73)). The plaintiff claims that she is "truly an exemplary teacher" (doc. 17 at 19). On a motion for summary judgment, a plaintiff's "own testimony . . . cannot establish a genuine issue as to whether [the plaintiff] was meeting [the employer's] expectations." *King*, 328 F.3d at 149 (citing *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) (citations omitted) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.")). The plaintiff also cites her "unblemished and successful 30 year career" at the elementary school where she previously worked (doc. 17

at 19). However, at issue here is the plaintiff's performance for the defendant at the time of her transfer to the ECC and the nonrenewal of her contract.

The plaintiff contends that Ms. Hildenbrand "acknowledged that 4 out of Plaintiff's 16 students were scoring at or above normal grade levels" based upon the most recent MAP scores, but Ms. Hildenbrand did not acknowledge that those students' scores had improved under her tutelage (*id.*). In the exhibit cited by the plaintiff, a memorandum to Mr. Vaughn dated January 15, 2015, Ms. Hildenbrand stated in pertinent part: "Based on her most recent MAP scores, [the plaintiff] only has 4 out of her 16 students scoring at or above normal grade level mean RIT. . . ." (doc. 14-3 at 31). Moreover, Ms. Hildenbrand noted that the plaintiff's students' MAP scores "showed a lack of progress," with only 47% of the students meeting their expected gains in reading and 23.5% meeting their expected gains in math (doc. 14-3 at 37). The plaintiff further cites as evidence of her "excellent teaching and performance" the fact that Ms. Hildenbrand featured the plaintiff's classroom in a video for the School Board modeling classrooms that had implemented the Responsive Classroom Program (doc. 17 at 7 (citing doc. 14-3 at 35)). In the notes by Ms. Hildenbrand that are cited by the plaintiff, Ms. Hildenbrand stated she did indeed film the plaintiff's class conducting the Morning Meeting greeting (doc. 14-3 at 35). She noted that several classes were filmed in an attempt to model expectations (*id.*). Ms. Hildenbrand further stated, in pertinent part:

> [The plaintiff] had been implementing the Morning Meeting with the four elements, but the timing was off and some elements were going longer than prescribed. She was working on building community and the initial "share" element was good. We videotaped the share for the Board and I had the expectation that I would see growth and improvement. Subsequent visits showed that there was insufficient planning and the time frame for the meeting was not following the school wide expectations. . . .

(*Id.*).

The defendant argues that the plaintiff was not meeting its legitimate expectations as evidenced by the December 2014 SAFE-T Summary in which Ms.

Hildenbrand and Ms. Scarborough assessed the plaintiff as not meeting expectations for three of the four domains, with an overall rating of "Not Met" on her preliminary evaluation (doc. 14-3 at 5-20).  The defendant further cites Ms. Louden's observation that the plaintiff's classroom "was not conducive" for learning, the need for Ms. Hildenbrand to help restore order to the plaintiff's classroom, the plaintiff's failure to establish a balanced literacy program, and the lack of progress for the plaintiff's students in MAP test scores (doc. 14-3 at 2-4, 30, 36-37).

Even assuming for purposes of this motion that the plaintiff could meet the *prima facie* tests for both her age and race claims, the defendant has offered a legitimate, nondiscriminatory reason for the plaintiff's discharge, as set forth above.  Job performance is well-recognized as a valid, non-discriminatory basis for an adverse employment decision. *Evans*, 80 F.3d at 960 (citations omitted).

The plaintiff has failed to establish that the defendant's stated reasons for transferring her to the ECC and not renewing her contract were a pretext for race and/or age discrimination.  "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.  However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. *Id*.  Accordingly, the court must evaluate "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id*. at 148-49. "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination." *Merritt v. Old Dominion Freight*,  601 F.3d 289, 294-95 (4th Cir. 2010) (citations omitted).

The plaintiff testified in her deposition that none of the decision makers with regard to her employment ever made negative comments regarding age or race (doc. 14-2, pl. dep. 77-78). Further, the plaintiff's performance was observed by several different evaluators who all reached a consensus that her performance was unsatisfactory. Moreover, Dr. Johnson is the same race as the plaintiff and approximately the same age, Assistant Superintendent Vaughn is older than the plaintiff, and Ms. Hildenbrand is over 40 and thus in the ADEA protected class. The fact that these decision makers are in the same protected class[es] as the plaintiff further weakens any possible inference of discrimination. *See, e.g., Brown v. OMO Group, Inc.*, C.A. No. 9:14-cv-2841-DCN, 2017 WL 1148743, at *4 (D.S.C. March 28, 2017) (finding fact that decisionmaker was member of same protected race group as the plaintiff was not dispositive of whether discrimination occurred but diminished any inference of race discrimination); *Ferguson v. Waffle House, Inc.*, 18 F. Supp. 3d 705, 722 (D.S.C. 2014) (noting that where the decisionmaker is a member of plaintiff's own protected class "any possible inference of discrimination" is weakened) (internal citations and quotations omitted).

Moreover, based on the recommendations of Dr. Johnson, Assistant Superintendent Vaughn, and Ms. Hildenbrand, the School Board approved the hiring of the plaintiff. These are the same individuals who decided, approximately five months later, to remove the plaintiff from her assigned third-grade classroom, reassign the plaintiff to an alternative position at the ECC, and recommend that her contract not be renewed after the end of the 2014-15 school year. The "same-actor" inference articulated by the Fourth Circuit Court of Appeals in *Proud v. Stone*, an age discrimination case, provides a "strong inference . . . that discrimination was not a determining factor" in a discharge decision when (1) the person who hired the plaintiff knew of the plaintiff's protected condition when the hiring decision was made, (2) the person who hired the plaintiff also fires her (3) within a

"relatively short time span following the hiring,"[3] and (4) the employer advances a legitimate and nondiscriminatory reason for the discharge. 945 F.2d 796, 797–98 (4th Cir. 1991). The Fourth Circuit has reasoned that " '[i]t hardly makes sense [for an employer] to hire workers from a group [it] dislikes . . ., only to fire them once they are on the job." *Id*. at 797.  The *Proud* inference has been extended to other discrimination statutes, including Title VII. *See Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir.1996). The same analysis applies here. District administrators and the School Board were fully aware of the plaintiff's race and age and recommended and approved her employment as a teacher. Thus, as the court noted in *Proud*, "it hardly makes sense" to argue that District administrators and the School Board were motivated by the plaintiff's race and/or age in terminating her employment when they were fully aware of those characteristics when deciding to hire her.

Here, the plaintiff has failed to submit evidence sufficient to permit a trier of fact to conclude that the defendant unlawfully discriminated against her because of her race and/or age.  Based upon the court's *McDonnell Douglas* analysis, it is recommended that summary judgment be entered in favor of the defendant on the plaintiff's race and age discrimination causes of action.

_____

[3] The plaintiff's argument that the inference should not apply because the court in *Proud v. Stone* described a "relative short time span following the hiring" as less than six months (doc. 17 at 24-25) is unavailing.  First of all, there is no indication in *Proud* that the requirement of a "relatively short time span" between hiring and termination is fixed at less than six months. Secondly, as the plaintiff admits, Ms. Hildenbrand's recommendation in January 2015 that the plaintiff's contract not be renewed "is the most relevant to consider for Plaintiff's pretext arguments because she is the initial source of the adverse actions taken against Plaintiff" (doc. 17 at 25 n.8). The plaintiff was hired on August 18, 2014, and, on January 27, 2015 (just over five months later), Dr. Johnson approved Ms. Hildenbrand's recommendation that the plaintiff be transferred to the ECC, and Ms. Hildenbrand recommended that the plaintiff's contract not be renewed (doc. 14-3 at 1, 33).  On February 27, 2015, Assistant Superintendent Vaughn notified the plaintiff that he was recommending to the Superintendent that the plaintiff's employment as an annual contract teacher not be renewed, and on April 27, 2015, following an informal hearing, the Superintendent accepted the recommendation (*id*. at 39, 44).  Given the "relatively short time span" between these events and the plaintiff's hiring, the undersigned finds that the *Proud v. Stone* inference is appropriate.

***Defamation***

The plaintiff also alleges a state court claim of defamation. To recover for defamation, the plaintiff has to prove: (1) a false and defamatory statement made by an agent of the defendant; (2) to a third party that was unprivileged; (3) the defendant was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *See Fleming v. Rose*, 567 S.E.2d 857, 860 (S.C. 2002). "The publication of a statement is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.*

The plaintiff claims that the defendant defamed her in word and writing by accusing her of a lack of classroom management, lack of instruction, and placing her hands on a student inappropriately (doc. 1-1, comp. ¶ 45). Further, the plaintiff alleges that District administrators said that she was "sick" and unable to teach due to sickness (*id.* ¶ 47). The plaintiff claims these statements were made with malicious intent and were published to the DOE, the literacy coach, two or more of her former students' parents, and possibly other members of the public (*id.* ¶ 46). In her deposition, the plaintiff testified as follows:

> Q: Do you have any information that anybody on the school board made, made false statements about you?
>
> A: I do not have any information.
>
> Q: Do you have any information that Darrell Johnson, the Superintendent, made any false statements about you to others?
>
> A: I do not have any information.
>
> Q: Do you have any information that Randy Vaughn made false statements about you to others?
>
> A: I do not have any information.
>
> Q: Do you have any information that Amy Hildenbrand made false statements about you to others?
>
> A: I do not have any information.

Q: Do you have any information that Patti Scarborough made false statements about you to any others?

A: I do not have any information.

Q: And do you know what was communicated to your third grade class at Mathews after you left or to the parents?

A: I do not know.

Q: Okay. You did not hear what was communicated to that class or the parents?

A: No.

(Doc. 14-2, pl. dep. 78-79).

As to any alleged statements to the parents of former students or the plaintiff's co-workers, the plaintiff has provided absolutely no evidence of a defamatory communication by an agent of the defendant. Moreover, with regard to any statements to the DOE, a statement made in connection with an employer's *bona fide* inquiry into possible employee misconduct is qualifiedly privileged.[4] *Wright v. Sparrow*, 381 S.E.2d 503, 506-507 (S.C. Ct. App. 1989) (citing *Bell v. Bank of Abbeville*, 44 S.E.2d 328 (S.C. 1947)). "Communications between officers and employees of a corporation are qualifiedly privileged if made in good faith and in the usual course of business." *Murray v. Holnam*, *Inc.*, 542 S.E.2d 743, 749 (S.C. Ct. App. 2001) (citation omitted). Where a defendant is entitled to a qualified privilege, a plaintiff can recover for defamation only if he or she can show that the defendant was motivated by actual malice in the publication of the allegedly defamatory statements. *Richardson v. McGill*, 255 S.E.2d 341, 342 (S.C. 1979). Here, the plaintiff has failed to establish a genuine issue of material fact as to any actual malice by the defendant in its statements to the DOE. *See Wright*, 381 S.E.2d at 507.

Based upon the foregoing, the defendant is entitled to summary judgment on the plaintiff's defamation cause of action.

---

[4] In its answer, the defendant raised the affirmative defense of qualified privilege as to the defamation claim (doc. 5 at 9).

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the undersigned recommends that the defendant's motion for summary judgment (doc. 14) be granted.

IT IS SO RECOMMENDED.


May 25, 2017                                    s/Kevin F. McDonald
Greenville, South Carolina                     United States Magistrate Judge